## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KURTRICE ROBERTS, *et al.*,

    *Plaintiffs*,

v.

EQUIAN, LLC, *et al.*,

    *Defendants*

No. 24-cv-2255-ABA

### MEMORANDUM OPINION

Plaintiffs Kurtrice Roberts, Erving Teah, and Tiffany Surrette were injured in car accidents, obtained treatment in hospital emergency departments, and filed personal injury lawsuits arising from those accidents. During the litigation of those lawsuits, Defendant Equian, LLC reached out to the attorneys who were representing Plaintiffs in those lawsuits and explained that Equian was acting on behalf of the physicians who had provided medical treatment to Plaintiffs. Those medical providers had not billed Plaintiffs' insurance for the treatment; instead, Equian on behalf of those providers requested that those attorneys "consider[]" allocating a portion of any settlement as payment for those expenses.

Plaintiffs, on their own behalf and a putative class, have sued Equian, as well as OptumInsight, Inc. (collectively, "Defendants"), alleging that by seeking to collect payment for the physicians' medical services in that way, as opposed to billing insurance and limiting their recovery to the amounts covered by insurance, Defendants have violated the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code, Com. Law §§ 14-202(8), (10), and (11); the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.*; common law (specifically for money had and

received, unjust enrichment, and negligence); the Maryland Declaratory Judgment Act ("MDJA"), Md. Code Ann., Cts. & Jud. Proc., § 3-406; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c), and (d).

Defendants have moved to dismiss all claims and have challenged this Court's personal jurisdiction over OptumInsight. ECF No. 36. The Court will grant the motion as to Plaintiffs' stand-alone MCPA claims, MDJA claim, and RICO claims, and will grant the motion to dismiss the claims against OptumInsight for lack of personal jurisdiction, but will deny the motion as to the remaining claims against Equian.

## BACKGROUND[1]

Plaintiffs each have either private or government-sponsored health insurance. ECF No. 33 ¶ 5. Plaintiffs were each involved in motor vehicle accidents for which they received medical treatment from "hospitals, physician practices and other medical providers" (which Plaintiffs define as the "Medical Providers"), and obtained a settlement from the third-party tortfeasors who caused the accidents. *Id.* ¶¶ 2, 4, 22-24. Plaintiffs allege that the Medical Providers did not submit Plaintiffs' medical bills to Plaintiffs' insurance providers and instead contracted with Defendants OptumInsight, doing business as Optum, and Equian "to act as debt collectors" for the alleged medical bills arising from Plaintiffs' post-accident treatment. *Id.* ¶ 3. Plaintiffs allege that the Medical Providers, through Defendants, charged Plaintiffs "the full undiscounted/rack-rate cost of services (the 'Full Rack Rate'), instead of the insurance-negotiated rates that each of the Medical Providers contractually or statutorily are obligated to charge directly

---

[1] At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

to the health insurer." *Id.* ¶ 6. Plaintiffs allege that these "extra amounts collected by Equian and Optum" are "illegal and uncollectible," and "must be returned to named Plaintiffs and Class Members," because "the services of the Medical Providers should have been billed to the private health insurance or government sponsored health insurance, which would have saved each named Plaintiff and Class member hundreds if not thousands of dollars." *Id.* ¶ 11.

As part of these alleged collection efforts, Defendants sent letters to the attorneys who were representing Plaintiffs in their personal injury lawsuits that stated as follows:

> Equian [or Optum in some letters] provides recovery services for MEP HEALTH LLC [, one of the Medical Providers,] when treatment is provided for injuries sustained in an accident. Our client is requesting consideration of their billed charges for payment during settlement of any claims or as any Personal Injury Protection or Medpay Benefits that may be available are issued. The cooperation of your client in our efforts to obtain a recovery is hereby requested.

*ECF No. 42-3 at 1;[2] see also* ECF Nos. 42-4 at 1, 42-9 at 1, 42-14 at 1. The letters also make the following request:

> Please contact me prior to settlement so that I may furnish you with an up-to-date total of any additional treatment provided by the Medical Group for this loss. Should you open settlement negotiations with any responsible party or insurer, please contact me so the Medical Group's interest can be addressed at the same time. However, should the case settle without our client's involvement, please retain an amount equal to the Medical Group's interest in trust and contact me in order to resolve this matter.

*Id.* The letters continue:

---

[2] Page citations are to the ECF page numbers, which may differ from the pagination used by the parties.

> At the time of payment, funds should be submitted to the
> medical group directly. If you plan on not submitting payment
> to the medical group you must contact Equian within ten days
> of receiving this letter to inform us where the payment will be
> sent so we can take appropriate action to ensure that the
> medical group's interest is fully protected in this matter.

*Id.*

The letters also include, on a separate page, a proposed agreement with a
signature line for Plaintiffs' counsel providing that Defendants "will agree to provide a
listing of the medical treatment provided by the Medical Provider and any other
information to which we have access that may be necessary to resolve this claim" and
"[i]n exchange, you acknowledge and agree to honor your client's obligation to
reimburse the Medical Provider the full amount of its charges without any reductions."
*Id.* at 5. These proposed agreements conclude as follows:

> This agreement is contingent upon a settlement or judgment
> in favor of your client. By signing below, you are also agreeing
> to keep the amount of MEP HEALTH LLC's interest in trust
> until such time as we mutually resolve this matter. Please
> review your file and advise if you are in agreement with this
> arrangement. If so, please sign below and return.

*Id.* The letters also include a separate page entitled "Consolidated Statement of
Charges," which lists the "Total Charges," "Amount Received," and "Balance Due"
regarding the medical services provided to each Plaintiff. *See*, *e.g.*, ECF No. 39. Plaintiffs
allege that Defendants are debt collectors and these letters are fraudulent attempts to
collect medical debt from Plaintiffs. ECF No. 33 ¶¶ 3-4; 36-44.

Plaintiffs filed an initial complaint in the Circuit Court for Montgomery County,
Maryland on June 14, 2024. ECF No. 2. After Defendants removed the case to this court,
Plaintiffs filed a first amended complaint. ECF No. 23. Defendants then filed a motion to

dismiss, which prompted Plaintiffs to file the current second amended complaint ("Complaint"). ECF Nos. 31 & 33. This Complaint alleges violations of the MCDCA in Counts 1 and 2, the MCPA in Count 3, money had and received in Count 4, unjust enrichment in Count 5, negligence in Count 6, the MDJA in Count 7, and RICO in Counts 8 through 10.

Defendants have moved to dismiss the Complaint. ECF No. 36. Plaintiffs responded to the motion and Defendants replied. ECF Nos. 38 & 44. Plaintiffs also filed a motion to strike the declaration and exhibits attached to the motion to dismiss, ECF No. 37, to which Defendants responded and Plaintiffs replied, ECF Nos. 43 & 51. In response to the motion to strike, Defendants filed a motion to file an amended declaration, ECF No. 42, to which Plaintiffs responded and Defendants replied. ECF Nos. 52 & 53. Defendants also filed two notices of supplemental authority, ECF Nos. 47 & 48, to which Plaintiffs responded, ECF Nos. 49 & 50. On June 13, 2025, the Court held a hearing on the motions. ECF No. 55.

## STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, when considering such a motion, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Id.* "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a p*rima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Id.* at 268. "When determining whether a plaintiff has made the requisite *prima facie* showing, the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff." *Id.* In other words, "[u]nlike under Rule 12(b)(6), the court may . . . consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019).

## DISCUSSION

### I.    Plaintiffs' Motion to Strike and Defendants' Motion for Leave to File an Amended Petition

Before reaching the merits of Defendants' motion to dismiss, the Court considers Plaintiffs' motions to strike (1) a declaration of Troy Stram, counsel for Equian and

6

OptumInsight, dated February 10, 2025 and submitted in support of Defendants'
motion to dismiss (ECF No. 36-3) and (2) Defendant's request for the Court to take
judicial notice of information on a state judiciary website. ECF No. 37. Defendants later
filed an amended declaration from Mr. Stram, dated March 24, 2025. ECF No. 42-2
(executed amended declaration); ECF No. 42-1 (redline showing changes). Regarding
the declaration, Plaintiffs argue that the exhibits attached to the February 10
declaration, which consist of some of the letters described above allegedly sent to
Plaintiffs by Defendants, are "incomplete," "doctored," and "misleading" because the
exhibits lack the "Consolidated Statement of Charges" page also described above. ECF
No. 37-1 at 9-10. Plaintiffs further allege that some of the exhibits are not referred to in
the Complaint or that Defendants incorrectly cited certain paragraphs of the Complaint
as referring to certain exhibits. *Id.* at 10. Plaintiffs also contend that the February 10
declaration did not comply with 28 U.S.C. § 1746 because it failed to affirm "under the
penalties of perjury," *id.* at 10-11, though the March 24 amended declaration does
contain that affirmation, ECF No. 42-2 at 5.

First, the Court concludes that the exhibits are not "doctored," but notes that they
do lack the last page regarding the statement of charges, which Plaintiffs have now
provided, curing any insufficiency in this regard.

Second, "[a]lthough as a general rule extrinsic evidence should not be considered
at the 12(b)(6) stage," courts can consider documents that "a defendant attaches . . . to
its motion to dismiss" if the document is "integral to and explicitly relied on in the
complaint and the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v.
Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l
Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). Here, the letters attached to the Stram

7

declaration form the basis of Plaintiffs' allegations and are integral thereto. Plaintiffs quote heavily from the letters and refer to them throughout the Complaint. *See, e.g.*, ECF No. 33 ¶¶ 163-68, 200-05, 238, 241-46. In fact, every section of the letters quoted above is referred to or quoted by Plaintiffs in their Complaint. Thus, the letters attached to the Stram declaration may be considered by the Court, regardless of whether Defendants initially inaccurately cited some paragraphs in the Complaint as referring to specific letters.

Third, as noted, Defendants have moved to file an amended declaration that complies with section 1746. ECF No. 42. Plaintiffs oppose the motion, contending that Defendants have made substantive rather than technical alterations to the declaration. The Court has reviewed the red-lined version of the amended declaration and disagrees. At most, Defendants have made changes that provide corrections and clarifications but do not materially alter the declaration. Thus, it will grant Defendants' motion to file an amended declaration, which cures the lack of proper affirmation.

Finally, at various points in the Complaint, Plaintiff allege that the letters sent by Defendants created a lien against them. *See*, *e.g.*, ECF No. 33 ¶ 280, *see also id*. ¶¶ 7, 18, 22-4, 59, 67-68, 99, 104, 106, 119, 122-23, 156, 195, 234, 281. In their motion to dismiss, while arguing that the letters do not create liens, Defendants state at footnote 9 that "the Maryland Judiciary Judgment and Liens Search [https://jportal.mdcourts.gov/judgment/judgementSearch.jsf] confirms that Equian has never placed a lien against any of the named Plaintiffs" and asks the Court to take judicial notice of that information on the government website. ECF No. 36-1 at 27 n.9. Plaintiffs object to this request, claiming that the website is irrelevant because it is not "a lien clearinghouse in Maryland." ECF No. 37-1 at 12. Likewise, they claim that the website may contain errors

and that it does not support the proposition for which Defendants cited it. *Id.* at 8. But Plaintiffs do not dispute the authenticity of the website. Accordingly, the Court will take judicial notice of the judiciary website, but will provide the information thereon the weight it deserves (if any) based on its relevance and accuracy. *See Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a . . . web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'") (quoting Fed. R. Evid. 201(b)); *Kitchings v. Shelton*, No. 17-cv-882-PWG, 2018 WL 398285, at *1 n.4 (D. Md. Jan. 12, 2018) (taking "judicial notice of the state court docket on the Maryland Judiciary Case Search website").

For these reasons, Plaintiffs' motion to strike will be denied and Defendants' motion to amend the Stram declaration will be granted.

## II.    Defendants' Motion to Dismiss

### A.    Lack of Personal Jurisdiction over OptumInsight

Defendants argue that this Court lacks general and specific jurisdiction over OptumInsight. Plaintiffs do not dispute the lack of general jurisdiction, but argue that this Court has specific personal jurisdiction over OptumInsight.

As set forth in Defendants' Local Rule 103.3 Disclosure Statement, Equian is a subsidiary of Equian Parent Corp., which is a subsidiary of OptumInsight, Inc., which is a subsidiary of OptumInsight Holdings, LLC., which is subsidiary of Optum, Inc., which is a subsidiary of United Healthcare Services, Inc. ECF No. 6; *see also* Ingram Declaration, ECF No. 36-2 at 2 ("OptumInsight is a wholly owned subsidiary of Optum, Inc. In September 2019, Optum, Inc. purchased Equian"). Plaintiffs contend that when Equian's parent company ("Equian Parent Corp.") became a direct subsidiary of

9

OptumInsight, Equian and OptumInsight began to "operate as one entity." ECF No. 38 at 43.

In determining whether the exercise of specific jurisdiction over a non-resident defendant comports with due process, courts "consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). Specific jurisdiction exists when a "defendant has 'purposefully directed' his activities at residents of the forum" and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

Where, as here, a plaintiff seeks to establish personal jurisdiction over a parent corporation based on its relationship with a subsidiary, the personal jurisdiction analysis operates in tandem with the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *Pennington v. Fluor Corp.*, 19 F.4th 589, 598 (4th Cir. 2021) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Based in part on the same principles underlying that liability rule, "it is generally the case that the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005).

"[I]n deciding whether to pierce the veil separating parent corporations from their subsidiaries *for jurisdictional purposes*," courts in cases arising under Maryland law use the "'agency' test," which "allows a court to attribute the actions of a subsidiary corporation to the foreign parent corporation only if the parent exerts considerable control over the activities of the subsidiary." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993) (emphasis added); *see also State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 447 (D. Md. 2019) ("Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil.") (quoting *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004)). Under that test, courts consider various factors to determine whether the requisite level of control exists, including "whether significant decisions of the subsidiary must be approved by the parent," "whether the parent and the subsidiary maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings," "the level of interdependence between parent and subsidiary," and whether the parent knows ", or should have known, that its conduct would have some impact in Maryland." *Mylan Lab'ys*, 2 F.3d at 61-62.

Here, Defendants argue that Plaintiffs have not established specific jurisdiction over OptumInsight for several reasons. They argue that Plaintiffs have lumped Equian and OptumInsight together in their Complaint and do not allege what facts establish specific jurisdiction over OptumInsight specifically. ECF No. 36-1 at 20. They further contend that OptumInsight does not perform the types of prebill medical recovery ("PMR") services described in the Complaint; instead its "business is to offer data analytics, research, consulting, technology, and managed services solutions to hospital systems, physicians, health plans, public entities, and life sciences companies to help

them improve performance, reduce costs, and meet compliance mandates." *Id.* (citing the declaration of Steven Ingram, OptumInsight's vice president of payment integrity, ECF No. 36-2 ¶¶ 5, 7-10). In short, Defendants contend, based on the facts set forth in the Ingram declaration, that "OptumInsight's business is completely unrelated to any of the activities giving rise to Plaintiffs' claims in the amended complaint." *Id.* at 21.

Plaintiffs, for their point, point out that Equian was purchased by UnitedHealth Group in 2019, which merged it with OptumInsight. ECF No. 33 ¶ 27. They argue that although OptumInsight and Equian are separate corporate entities, "[a]s merged entities, they operated as one." ECF No. 38 at 35. Plaintiffs argue that this Court should impute Equian's alleged actions to OptumInsight for jurisdictional purposes because the Complaint alleges that "Optum, *through its association with Equian*, engages in debt collection activities on behalf of medical providers in Maryland, targeting Maryland residents including Plaintiffs for the collection of medical debts arising from personal injuries." ECF No. 38 at 45 (emphasis added, citing ECF No. 33 ¶¶ 25, 31). Plaintiffs also point out that some of the letters sent to Plaintiffs refer to "Optum," and that although various entities in the corporate family contain "Optum" as part of their name, the use of that name in some of the correspondence means that "Optum[Insight] itself directly engaged in collection activity in its own name and demanded payment from Maryland settlements." *Id.* at 46 (citing ECF No. 33 ¶¶ 119, 122). Plaintiffs continue that "Optum" (which, again, Plaintiffs ask this Court to read as synonymous with OptumInsight) "sent multiple letters addressed to the Maryland resident Plaintiffs' Maryland attorneys, as part of its efforts seeking to collect money from them." *Id.* (citing ECF Nos. 36-11 through 36-14).

Here, Plaintiffs have not proffered specific facts that would support piercing the corporate veil or that otherwise establish personal jurisdiction over OptumInsight. Plaintiffs have not established that OptumInsight engages in the alleged debt collecting activities that form the basis of Plaintiffs' allegations. As stated, in ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a court's consideration is not limited to the allegations in the complaint and, among other things, it may "consider affidavits submitted by both parties." *Hawkins*, 935 F.3d at 226. Here, Plaintiffs rely only on their allegations. But those allegations are contradicted by the Ingram declaration, which explains that "OptumInsight never provided PMR services . . . [i]nstead, those PMR services were performed by Equian." ECF No. 36-2 ¶ 9. "When a defendant's sworn affidavit contradicts the allegations in the complaint, the plaintiff bears the burden to present an affidavit or other evidence showing jurisdiction exists." *Varieur v. BIS Glob.*, No. 16-cv-3111-PX, 2017 WL 4387054, at *1 (D. Md. Oct. 2, 2017) (citing *Wolf v. Richmond Cty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984)). Plaintiffs have not produced evidence rebutting the Ingram declaration.

Plaintiffs have failed to meet their *prima facie* burden of establishing that this Court has personal jurisdiction over OptumInsight. Therefore, the claims against OptumInsight will be dismissed without prejudice.

## B.    Maryland Consumer Debt Collection Act ("MCDCA") and Maryland Consumer Protection Act ("MCPA") Claims

### 1.    MCDCA (Counts 1 and 2)

Plaintiffs raise three claims under the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-202. In pertinent part, the statute makes it unlawful for a "collector" who is "collecting or attempting to collect an alleged debt" to: "[c]laim,

attempt, or threaten to enforce a right with knowledge that the right does not exist" (§ 14-202(8)) (Count 1), "[e]ngage in unlicensed debt collection activity in violation of the Maryland Collection Agency Licensing Act" (§ 14-202(10)) (also Count 1), or "[e]ngage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act" (§ 14-202(11)) (Count 2). A "Collector" is "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction." Md. Code, Com. Law § 14-201(b). A "consumer transaction" is "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." *Id.* § 14-201(c).

Plaintiffs allege that Equian is a "collector" within the meaning of § 14-201(b), and a "debt collect[or]" within the meaning of § 14-202(10), because it was working on behalf of the Medical Providers who provided medical services to Plaintiffs to collect payment for those services, services that constitute "consumer transaction[s]" within the meaning of § 14-201(b). Plaintiffs allege that Equian's letters "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist" within the meaning of § 14-202(8) because although Equian attached a Consolidated Statement of Charges that set forth a "Balance Due," Plaintiffs did not in fact owe the Medical Providers anything.

To understand Plaintiffs' claim that Equian was seeking to enforce rights that the Medical Providers did not have requires a bit of background. Plaintiffs each "had health insurance in one form or another," either private health insurance or "government sponsored insurance such as Medicare and/or Medicaid." ECF No. 33 ¶ 5. Ordinarily, the medical providers would have billed the patients' respective benefit plans or government payors for those services. *Id.* If the medical providers had done so, the

14

payment amounts would have been capped, based on the terms of the applicable benefit

plan, or contract negotiation, or as a matter of law. *Id.* ¶ 36. Those rates, Plaintiffs

allege, are lower than the "full undiscounted/rack-rate cost of services." *Id.* ¶¶ 6, 9.

Thus, "[w]ith respect to the named Plaintiffs and Class members in this case," Plaintiffs

allege that the amount Plaintiffs owed for the medical services they received was "pre-

determined since the Medical Providers have entered into contracts with either private

health insurance carriers (including, but not limited to Plaintiffs' insurers), or the State

of Maryland or Federal Government – *i.e.*, Medicaid and Medicare – to accept as

payment in full the contractual or statutory allowances for the patient's medical

treatment." *Id.* ¶ 36. Plaintiffs further allege that "Medical Providers are precluded by

contract (and/or statute) with health insurance carriers and the government from

seeking payment for their services above the contractual allowances from the insured

patient." *Id.* ¶ 37; *see also id.* ¶ 49-50 (explaining that this is generally referred to as

"balance billing").

    Plaintiffs allege that the Medical Providers, knowing that Plaintiffs had been

injured in car accidents and thus might receive a settlement or judgment, and wanting

to collect something closer to their Full Rack Rate than they would receive from

insurance or a government payor, chose not to bill insurance and instead engaged

Equian's services. Equian then sent the letters at issue here, including a "Consolidated

Statement of Charges" that listed the patient's name, date of injury, treatment facility,

date of service, and procedure code, and then listed the "Total Charges," "Amount

Received," and "Balance Due" for those medical services. *See, e.g.*, ECF No. 39 at 4. But

Plaintiffs allege that the Medical Providers, or Equian on the Medical Providers' behalf,

should never have been billing Plaintiffs—let alone for the Full Rack Rate—but instead

should have been billing insurance and accepting as payment in full the amounts covered by those payors. ECF No. 33 ¶¶ 6-11.

The parties have addressed but have not fully fleshed out whether, as a matter of law, the Medical Providers were actually prohibited from balance billing in these contexts. *See* ECF No. 36-1 at 14 & nn. 3-4; ECF No. 38 at 13 n.6. In some contexts medical providers are not only permitted to balance-bill patients but are *required* to do so, at least according to some payors when it comes to out-of-network providers. *See, e.g.*, *Connecticut Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017). But for pleadings purposes, the factual allegations here are that Equian's clients were precluded from balance-billing their patients, or at least from billing their patients more than the amounts that the providers would have collected if they had submitted the bills to insurance. Thus, Plaintiffs allege, when Equian represented that there was a "Balance Due" for the medical services that Plaintiffs had received, *see, e.g.*, ECF No. 39 at 4, and requested that Plaintiffs' attorneys "acknowledge and agree" that Plaintiffs were under an "*obligation* to reimburse the Medical Provider the full amount of its charges without any reductions," *see, e.g.*, ECF No. 42-9 at 5 (emphasis added), Equian was making a "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist" in violation of the MCDCA, Md. Code Ann., Com. Law § 14-202(8).

Defendants argue that Counts 1 and 2 both fail for three common reasons.

First, Defendants argue that Plaintiffs' allegations do not establish that Equian was a "collector" within the meaning of the MCDCA because it was merely requesting that Plaintiffs give "consideration" to Equian's request to transmit a portion of any personal injury settlement to Equian's medical provider clients. ECF No. 36-1 at 21-24.

16

This argument is untenable when considering Plaintiffs' factual allegations, which must be accepted as true at this stage. Plaintiffs have plausibly alleged that the Equian letters constituted demands that Plaintiffs transmit a portion of any settlement to Equian's clients. *See, e.g.*, ECF No. 33 ¶¶ 7 (alleging that "Equian and Optum, acting as debt collectors, contact the Consumer and/or their legal counsel in their personal injury actions, and . . . demand payment of the Full Rack Rate" for the medical services provided). Equian's demands may have been more politely worded than some collection notices, and may have been framed as a request that Plaintiffs *agree* to allocate a portion of any settlement to Equian's clients. But there is no politeness exception in the MCDCA; a "collector" who says "please" is still a "collector."

Second, Defendants argue that even if requesting that Plaintiffs "consider[]" paying Equian's clients as part of any settlement qualified as "collection," the letters were not seeking collection *from Plaintiffs* but rather from the tortfeasors who had injured Plaintiffs and whom Plaintiffs had sued. ECF No. 36-1 at 29-30. But this argument too would require disregarding Plaintiffs' factual allegations. Plaintiffs each were injured in auto accidents, and sued their tortfeasors, seeking damages. ECF No. 33 ¶¶ 2, 4, 22-24. Plaintiffs' allegation is that Equian was demanding payment of a portion of any settlement of those cases. Plaintiffs have alleged that if they were to agree to those demands, that would necessarily reduce the amount of money Plaintiffs would personally receive. *E.g.*, *id.* ¶ 210 ("The $555.58 paid to MEP as a result of Equian and Optum unfair, abusive and deceptive unlicensed debt collection scheme, reduced the Mr. Teah's recovery from his tort suit.").

Defendants hypothesize the opposite: that there is a knowable number at which Plaintiffs' cases would have settled in the absence of Equian's demands, and a different

(higher) number at which they did settle in light of those demands. *See, e.g.*, ECF No. 36-1 at 29. From that premise, Defendants contend that, in essence, they were demanding payment by the tortfeasors whom Plaintiffs had sued. *Id.* at 29 n.10. Personal injury settlements can be structured in any number of ways, but here Plaintiffs have alleged, plausibly, that the effect of Equian's demands, and the Plaintiffs' payments, was to reduce the amount that Plaintiffs would personally receive from the settlements. Whether the demand was reasonable or lawful is a separate question; the point for current purposes is that the demand was made, at least in part, to Plaintiffs through their counsel. Defendants' argument that Equian was really making a demand to the tortfeasors does not provide a valid basis for dismissal of Counts 1 and 2.

Third, Defendants argue that Equian was not a "collector" because insofar as it was "collecting or attempting to collect an alleged debt," that debt did not "aris[e] out of a consumer transaction," as required by § 14-201(b) and (c). ECF No. 36-1 at 21-22. Their argument is that Equian's letters did not pertain to a "consumer transaction" because the "damages did not 'arise out of any consensual or business dealing'" but rather "out of an automobile accident." ECF No. 36-1 at 22 (quoting *Kazmi v. CCS Com., LLC*, 2015 WL 4392836, at *2 (D.N.J. July 15, 2015)). As noted above, under the MCDCA a "consumer transaction" is "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." *Id.* § 14-201(c). Here, Plaintiffs have alleged, and indeed there is no dispute, that Plaintiffs received emergency medical services. *E.g.*, ECF No. 33 ¶¶ 22-24. And medical services constitute consumer transactions. *See Long v. Pendrick Cap. Partners II, LLC*, 374 F. Supp. 3d 515, 538 (D. Md. 2019) (denying summary judgment on a MCDCA claim premised on medical debt); *Garner v. ClaimAssist*, LLC, Case No.

16-cv-1260-ELH, 2017 WL 1093276, at *14 (D. Md. Mar. 22, 2017) (denying dismissal of an FDCPA claim premised on a hospital lien); *see also Gilmore v. Acct. Mgmt., Inc.*, 357 F. App'x 218, 220 (11th Cir. 2009) (in context of Georgia's Fair Business Practices Act, providing that "a consumer transaction occurred when [the defendant] provided [the plaintiff] medical services.") (quoting 1*st Nationwide Collection Agency, Inc. v. Werner*, 288 Ga. App. 457, 459 (2007)). In other words, Plaintiffs have plausibly alleged that the medical services they received arose not only from their accidents but also from the "consumer transaction[s]" (*i.e.*, medical treatments) that were necessitated by those accidents.

Those three arguments pertain to both Counts 1 and 2. Defendants also make one other argument specific to Count 1, and one argument specific to Count 2.

First, with respect to the portion of Count 1 pled under § 14-202(10), which prohibits a "collector" that is "collecting or attempting to collect an alleged debt" from "[e]ngag[ing] in unlicensed debt collection activity in violation of the Maryland Collection Agency Licensing Act," Md. Code, Com. Law § 14-202(10), Defendants argue that Equian is not a "collection agency" and thus was "not required to be licensed under the Maryland Collection Agency Licensing Act ("MCALA"). ECF No. 36-1 at 25.[3] The MCALA applies "whenever the person does business as a collection agency in the State." Md. Code Ann., Bus. Reg. § 7-301(a). Equian does not hold itself out as a collection

---

[3] As noted above, Count 1 proceeds under both § 14-202(8) and (10). Equian's "collection agency" argument pertains only to the latter. Beyond the three arguments addressed above, Equian does not dispute that Plaintiffs have stated a claim under § 14-202(8), which applies when a collector "[c]laim[s], attempt[s], or threaten[s] to enforce a right with knowledge that the right does not exist." Md. Code, Com. Law § 14-202(8).

agency as such, but the statute has an explicit definition of what constitutes a "Collection agency" within the meaning of the statute:

> "Collection agency" means a person who engages directly or indirectly in the business of:
>
> (1)
>
>> (i) collecting for, or soliciting from another, a consumer claim; or
>> (ii) collecting a consumer claim the person owns, if the claim was in default when the person acquired it;
>
> (2) collecting a consumer claim the person owns, using a name or other artifice that indicates that another party is attempting to collect the consumer claim;
>
> (3) giving, selling, attempting to give or sell to another, or using, for collection of a consumer claim, a series or system of forms or letters that indicates directly or indirectly that a person other than the owner is asserting the consumer claim; or
>
> (4) employing the services of an individual or business to solicit or sell a collection system to be used for collection of a consumer claim.

*Id.* § 7-101(c). Here, Count 1's claim under § 14-202(10) sufficiently alleges that Equian was "do[ing] business as a collection agency" because Plaintiffs' factual allegations, accepted as true, reflect that Equian was, at minimum, "collecting for . . . a consumer claim." *Id.* § 7-301(c)(1)(i); *see* ECF No. 33 ¶¶ 113-126, 158, 198, 236, 253, 273.[4]

---

[4] Because Plaintiffs' Com. Law § 14-202(10) claim in count 1 satisfactorily alleges that Equian constitutes a collection agency under Bus. Reg. § 7-101(c)(1)(i), the Court need not and does not decide whether the allegations would also render Equian a collection agency under other components of § 7-101(c).

Second, with respect to Count 2, Defendants argue that Equian did not "[e]ngage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act," Md. Code, Com. Law § 14-202(11). ECF No. 36-1 at 13, 25-28. Plaintiffs specifically allege that Equian violated the FDCPA by "using coercion [and] deception," ECF No. 33 ¶ 307; by making "false and misleading representations to the Plaintiffs" including specifically the representation that Plaintiffs "were obligated to pay the medical debt," *id.* ¶ 310; and by "asserting a lien" when Equian was not entitled to do so, *id.* ¶ 311. Here, and for the reasons discussed above, the complaint satisfactorily alleges at least that Equian made false and misleading representations to Plaintiffs' counsel about the alleged debt.

For these reasons, accepting Plaintiffs' allegations as true, Counts 1 and 2 state claims on which relief can be granted, and the motion to dismiss those counts will be denied.

### 2.    MCPA (Count 3)

Count 3 arises under the Maryland Consumer Protection Act. Under the MCPA, "[a] person may not engage in any unfair, abusive, or deceptive trade practice . . . in (1) [t]he sale . . . of any consumer goods . . . or consumer services; (2) [t]he offer for sale . . . of consumer goods . . . or services; . . . [or] (5) [t]he collection of consumer debts." Md. Code, Com. Law § 13-303(1)-(2), (5). The MCPA lists various categories of conduct that comprise "[u]nfair, abusive, or deceptive trade practices." *Id.* § 13-301. One category of conduct that constitutes an MCPA violation is any "[v]iolation of a provision of" the MCDCA. *Id.* § 13-301(14)(iii).

As set forth in the Complaint, Plaintiffs appear to have originally conceived of Count 3 as pleading independent violations of several provisions of the Consumer

Protection Act. *See, e.g.*, ECF No. 33 ¶ 321 ("Defendants and the Medical Providers are each merchants of consumer services and consumer credit within the meaning of the MCPA § 13-101(g), and are subject to all MCPA provisions prohibiting unfair and deceptive trade practices, including those in Md. Code Ann., Com. Law §§ 13-303 and 13-301."). Accordingly, Defendants present multiple arguments why Plaintiffs' MCPA claims at Count 3 fail. *See, e.g.*, ECF No. 36-1 at 20-21 (arguing that Equian is not a "merchant" and thus cannot be liable under Md. Code, Com. Law § 13-303(6), which applies to a "purchase or offer for purchase of consumer goods or consumer realty from a consumer by a merchant whose business includes paying off consumer debt in connection with the purchase of any consumer goods or consumer realty from a consumer"); *see also* ECF No. 36-1 at 30-33 (other arguments, attacking theories under other MCPA provisions).

In responding to the motion to dismiss Count 3, Plaintiffs clarify and substantially narrow the claim. They simply argue that because they have adequately alleged a violation of the MCDCA, they have adequately alleged a violation of MCPA. ECF No. 38 at 29-30; *see* Md. Code, Com. Law § 13-301(14)(iii); *Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 382, *aff'd*, 486 Md. 616 (2024). In other words, Plaintiffs have clarified that the sole MCPA provision pertinent to Count 3 is § 13-301(14)(iii), which provides that a violation of "Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act" constitutes an "[u]nfair, abusive, or deceptive trade practice[]" under the MCPA.

Having concluded above that Plaintiffs have stated claims under the MCDCA, the Court further concludes that Plaintiffs have adequately alleged a derivate violation of the MCPA and will deny Defendants' motion as to this claim in Count 3. Because Plaintiffs

do not dispute Defendants' arguments with respect to the other portions of § 13-301, they have waived any claims that they otherwise intended to pursue as part of Count 3. *See, e.g., Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop its argument.'") (quoting *Brown v. Nucor Corp.,* 785 F.3d 895, 923 (4th Cir. 2015)) (cleaned up); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to this argument, the plaintiff abandons any discriminatory discharge claim."); *Kitchings v. Shelton*, Case No. 17-cv-882-PWG, 2018 WL 398285, at *6 (D. Md. Jan. 12, 2018) ("When a defendant's motion to dismiss a complaint states specific deficiencies that warrant dismissal, and presents supporting legal arguments, it is the plaintiff's obligation to respond substantively to address them. Failure to respond to the defendant's arguments constitutes abandonment of those claims."); *see also Parker v. Goldman Sachs Mortg. Co. Ltd. P'ship*, 596 F. Supp. 3d 559, 571-72 (D. Md. 2022) ("Whether Plaintiffs' standalone claims under the MCPA can survive is a separate question" from whether their derivative MCPA claims are viable). Defendants allege that Plaintiffs failed to allege a derivative MCPA claim, and thus all Plaintiffs' MCPA claims must be dismissed, but this is inaccurate. *See* ECF No. 33 ¶ 12 ("Equian and Optum's violations of the MCDCA are per se 'unfair, abusive, or deceptive trade practices' which violate the . . . 'MCPA.'").

For these reasons, Count 3 states a claim under the Maryland Consumer Protection Act, but may proceed only with respect to the claim that Equian violated the MCPA by violating the MCDCA.

### C.    Common Law Claims

In addition to the Maryland statutory claims discussed above, and the federal RICO claims discussed below, Plaintiffs assert three claims under Maryland common law. This section addresses those claims.

### 1.    Money Had and Received (Count 4)

Defendants claim that Plaintiffs fail to plausibly plead a claim for money had and received. ECF No. 36-1 at 50. Generally, a claim for money had and received "'lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain.'" *Bourgeois v. Live Nation Ent., Inc.*, 430 Md. 14, 46 (2013) (quoting *Benson v. State*, 389 Md. 615, 652-53 (2005)). Defendants argue that because Plaintiffs' claim is based on an insufficiently alleged MCALA violation, it fails to fit into the limited situations where such an action applies under *Bourgeois. Bochenski v. M&T Bank*, Case No. 14-cv-1031-ELH, 2015 WL 1040281, at *25-26 (D. Md. Mar. 10, 2015).

The exact contours of the "money had and received" cause of action under Maryland are not entirely clear. *See id.* (noting that such "common law counts are rarely pled any more"). But at least for current purposes, at the pleadings stage, Plaintiffs have alleged sufficient facts to proceed on Count 4. As explained above, Plaintiffs have alleged that Equian was acting as an unlicensed debt collector, and that it demanded and collected sums that Plaintiffs were not under a legal obligation to pay. As the Supreme Court of Maryland put it in *Bourgeois*, "Although an action for money had and received may be based on money paid under mistake of fact or law, that is not the only basis for the action." 430 Md. at 48. "Maryland cases have found it available to recover money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in

certain circumstances, paid under an executed illegal contract." *Id.* That formulation sufficiently encompasses the factual scenario alleged here that, at least for pleadings purposes, Count 4 states a claim on which relief can be granted. *See Sullivan v. YES Energy Mgmt., Inc.*, Case No. 22-cv-0418-GJH, 2022 WL 4777791, at \*11 (D. Md. Sept. 30, 2022) ("Plaintiff has plausibly alleged that the MCPA, at minimum, was enacted to protect consumers like her, and as such, the money had and received claim is sufficiently alleged on those grounds."). The Court will therefore deny dismissal of Count 4.

### 2.    Unjust Enrichment (Count 5)

Unjust enrichment requires "1. A benefit conferred upon the defendant by the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements*, LLC, 402 Md. 281, 295 (2007). Defendants argue that Plaintiffs did not confer a benefit on Equian, and Equian did not retain any benefit because it "merely facilitated" the collection of the money from Plaintiffs for Equian's clients. ECF No. 36-1 at 49. Plaintiffs, however, allege that Equian retained part of what it collected from Plaintiffs' settlements in the form of a contingency fee. *See e.g.* ECF No. 33 ¶¶ 79-80, 86-87, 174, 211, 252. Thus, Plaintiffs have adequately alleged that Equian's practice conferred a benefit on it (the contingency fee) at Plaintiffs' cost. The Court will deny the motion to dismiss as to this claim.

### 3.    Negligence (Count 6)

Defendants argue that Plaintiffs' negligence claim is barred by Maryland's economic loss rule, under which "plaintiffs generally may not recover for purely

economic losses" pursuant to a negligence claim in the absence of physical injury or
"serious risk of death or personal injury." *Bryant v. Koppers, Inc.*, 627 F. Supp. 3d 466,
476 (D. Md. 2022), *aff'd*, 2023 WL 3053017 (4th Cir. Apr. 24, 2023). An exception to
that rule applies where there is an "intimate nexus between the parties" created by
"contractual privity or its equivalent." *Jacques v. First Nat. Bank of Maryland*, 307 Md.
527, 534-35 (1986).

Plaintiffs argue that they have sufficiently pled an "intimate nexus" by alleging
that Defendants collected money from the individual Plaintiffs on behalf of the Medical
Providers. *See, e.g.*, ECF No. 33 ¶¶ 53-71; *see Sullivan*, 2022 WL 4777791 at *10 (finding
an intimate nexus where, even though the parties were not in privity, the defendant
collected money directly from the plaintiff and sent her bills). Defendants counter that
there is no intimate nexus because "Equian did not collect money directly from the
individual plaintiffs, they collected it from liable third parties." ECF No. 44 at 27 (citing
ECF No. 33 ¶ 63). Here, Plaintiffs have alleged that Equian, acting on behalf of medical
providers who provided medical services directly to Plaintiffs, issued written notices to
Plaintiffs' attorneys requesting to be paid a portion of settlement proceeds from auto
accidents in which Plaintiffs suffered injuries, based on outstanding expenses for those
medical services. These allegations adequately allege a sufficiently "intimate nexus" such
that the economic loss rule does not entitle Defendants to dismissal of Plaintiffs'
negligence claim. Therefore, the Court will deny Defendants' motion as to Count 6.

### D.    Declaratory Judgment (Count 7)

Defendants argue that Plaintiffs' declaratory relief claim must be dismissed
"because such relief does not constitute an independent claim." ECF No. 36-1 at 50
(quoting *Manago v. Cane Bay Partners VI, LLLP*, Case No. 20-cv-0945-LKG, 2022 WL

4017299, at *9 (D. Md. Sept. 2, 2022)). Instead, a declaratory judgment is a form of relief that requires "the court [to] have a valid cause of action before it." *Manago*, 2022 WL 4017299, at *9 (D. Md. Sept. 2, 2022) (quoting *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 742 (D. Md. 2006)). Plaintiffs do not respond to this argument and, therefore, the Court will dismiss Count 7 insofar as it pleads a cause of action for a declaratory judgment independent of Plaintiffs' substantive causes of action. Declaratory judgment as a form of relief, however, may still be available to Plaintiffs.

### E. Racketeer Influenced and Corrupt Organizations Act ("RICO") Claims under Section 1962(a), (c), and (d) (Counts 8 through 10)

In Counts 8 through 10, Plaintiffs allege civil RICO violations under 18 U.S.C. §§ 1962(a), (c), and (d), respectively. Section "1962(a) makes it unlawful for a person who has received income from a 'pattern of racketeering activity' to 'use or invest' such income in an enterprise engaged in or affecting interstate or foreign commerce.*" Busby v. Crown Supply, Inc.*, 896 F.2d 833, 835 (4th Cir. 1990). "Section 1962(c) prohibits any person 'employed by or associated with' such an enterprise from conducting its affairs through 'a pattern of racketeering activity." *Id.* Finally, section 1962(d) prohibits a person from "conspir[ing] to violate any of the [other] provisions of" of section 1962. 18 U.S.C § 1962(d). Thus, a 1962(c) claim requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). And "[t]o allege a violation of § 1962(a), a plaintiff must show (a) receipt of income from a pattern of racketeering activity, and (b) the use or investment of this income in an enterprise." *Busby*, 896 F.2d at 837. A plaintiff must also plead that

the plaintiff suffered harm "by reason of" the RICO violation. *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 6 (2010) (quoting 18 U.S.C. § 1964(c)).

Defendants argue that each of the RICO counts fails to state a claim on which relief can be granted, for various reasons, some common to all the counts, others specific to particular counts. The Court concludes that all of those counts are subject to dismissal because Plaintiffs have not adequately alleged racketeering crimes and a pattern thereof; accordingly the Court need not reach Defendants' other arguments with respect to the RICO counts.

One element of Plaintiffs' claims under both section 1962(a) and (c) is that Defendants engaged in a pattern of racketeering activity. 18 U.S.C. § 1962(a) & (c). "Racketeering activity" is defined as any of the enumerated crimes identified in 18 U.S.C. § 1961(1), which include the three crimes cited by Plaintiffs as the bases of their RICO claims: mail and wire fraud (18 U.S.C. §§ 1341 and 1343) and interstate transport of money converted or fraudulently obtained (18 U.S.C. § 2314). *See* ECF No. 33 ¶¶ 367-68, 380-82. "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Under Rule 9(b), a complaint must allege the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*: Civil § 1297, at 590 (2d ed. 1990)).

To state a RICO claim premised on the crimes of mail or wire fraud, Plaintiffs must establish: (1) the existence of a scheme to "defraud, or [obtain] money or property by means of false or fraudulent pretenses, representations, or promises" and (2) the use

of the mail or interstate wire communication to further that scheme. 18 U.S.C. §§ 1341 & 1343; *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012); *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). "And the element 'to defraud' has 'the common understanding of wronging one in his property rights by dishonest methods or schemes and usually signify[ing] the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Wynn*, 684 F.3d at 477 (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). Likewise, to show criminal interstate transport of fraudulently obtained money under section 2314, Plaintiffs must establish that Equian (1) transported money through interstate channels, (2) "knowing the same to have been . . . taken by fraud." 18 U.S.C. § 2314. A RICO claim requires "at least two" acts of racketeering activity within a 10-year period. 18 U.S.C. §§ 1961(5). To establish the necessary pattern, a plaintiff also must show (1) a relationship between the predicate acts and (2) a threat of continued criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

RICO "does not cover all instances of wrongdoing," but rather "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). The Fourth Circuit has held that courts should be "cautious about basing a RICO claim on predicate acts of mail and wire fraud" in order to "preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity," noting that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Anderson v. Foundation for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)).

Similarly, courts must also "ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions." *U.S. Airline Pilots*, 615 F.3d at 317 (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989)). "RICO liability is reserved for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (quoting *Menasco*, 886 F.2d at 684). The Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp.*, 841 F.2d at 538. Courts in this circuit use a flexible approach in determining whether plaintiffs have alleged an adequate pattern of racketeering activities, engaging in "a case-by-case" analysis that "looks to the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)). As part of this analysis, "[t]he gravity and extent of the misconduct must reflect that it is 'part of a prolonged criminal endeavor.'" *Ritu Bhambhani, LLC v. Neuraxis, Inc.*, Case No. 22-cv-1732-RDB, 2023 WL 3688336, at *10 (D. Md. May 25, 2023) (quoting *Menasco*, 886 F.2d at 683-84).

Plaintiffs allege that the Medical Providers engaged Equian to recover payment for medical services from Plaintiffs who were injured by third parties and who received settlements from those third parties, and that the alleged enterprise members were not entitled to do so. *See* ECF No. 33 ¶¶ 3-11. In the letters at issue, Equian represented that its "client is requesting consideration of their billed charges for payment during settlement of any claims" and that "[t]he cooperation of your client in our efforts to obtain a recovery is hereby requested." *See, e.g.*, ECF No. 42-3 at 1. The letters also request that "should the case settle without our client's involvement, please retain an

amount equal to the Medical Group's interest in trust" and that "[i]f you plan on not submitting payment to the medical group you must contact Equian within ten days of receiving this letter to inform us where the payment will be sent." *Id.* Finally, attached to the letters is a proposed agreement under which, if Plaintiffs agreed to transmit a portion of settlement proceeds to the doctor who provided medical services for the injuries caused by the accident, Plaintiffs' attorneys were to "acknowledge and agree to honor [the patient's alleged] obligation to reimburse the Medical Provider the full amount of its charges without any reductions." *Id.* at 5.

Plaintiffs allege that these letters are fraudulent because they "threaten to enforce a right with knowledge that the right does not exist." Md. Code, Com. Law § 14-202. As explained above, Plaintiffs were injured in car accidents and obtained medical treatment from emergency physicians, and Plaintiffs allege that the Medical Providers were prohibited, by regulation or contract, from billing Plaintiffs for the medical treatment, or at least from billing their Full Rack Rate. *See* § II.B.1, *supra*. Thus, Plaintiffs argue, it was false for Equian to represent that there was any "Balance Due" for the medical services that Plaintiffs had received, *see, e.g.*, ECF No. 39 at 4, and also false or misleading to request that Plaintiffs' attorneys "acknowledge and agree" that Plaintiffs were under an "*obligation* to reimburse the Medical Provider the full amount of its charges." *See, e.g.*, ECF No. 42-9 at 5 (emphasis added).

Plaintiffs plausibly allege that, at least for some Plaintiffs and a portion of the putative class, Equian's letters may have been deceptive in implying that Plaintiffs were responsible for paying the Full Rack Rate when they were not. Plaintiffs also allege that Equian's letters constitute an unlicensed attempt to collect a debt. But particularly because any claim of fraud must be pled with particularity, Fed. R. Civ. P. 9(b), Plaintiffs

have not adequately alleged that that Defendants' communications amount to a pattern of criminal fraud sufficient to trigger RICO's "drastic" penalties. *U.S. Airline Pilots Ass'n*, 615 F.3d at 317 ("The Supreme Court has described the penalties authorized by RICO as 'drastic.'") (quoting *H.J. Inc.*, 492 U.S. at 233).

Ultimately, as in *Ritu*, a case involving allegedly fraudulent statements that an electroacupuncture device was billable to Medicare when it was not, "Plaintiffs' allegations amount only to ordinary commercial fraud, and do not resemble the persistent, widespread, organized criminal activity that RICO was designed to curtail." *Ritu*, 2023 WL 3688336, at *7. "[T]his case is not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238.

For these reasons, Plaintiffs do not state claims under RICO sections 1962(a) and (c). This conclusion also entitles Defendants to dismissal of Count 10, Plaintiffs' RICO conspiracy claim under section 1962(d). When "the pleadings do not state a substantive RICO claim . . . Plaintiffs' RICO conspiracy claim fails as well." *GE Inv. Priv. Placement Partners II*, 247 F.3d at 551 n.2; *see also AMA Sys., LLC v. 3B Tech, Inc.*, 21-cv-1472-DBL, 2022 WL 2133905, at *12 (D. Md. June 14, 2022). Because Plaintiffs have failed to adequately allege section 1962(a) or (c) RICO claims, they also have not adequately pled a conspiracy claim under section 1962(d).

## CONCLUSION

By separate order, the Court will grant in part and deny in part Defendants' motion to dismiss. First, the Court will dismiss OptumInsight without prejudice for lack of personal jurisdiction. Second, the Court will dismiss with prejudice (1) Plaintiffs' stand-alone MCPA claims in Count 3 because Plaintiffs have failed to defend those claims; (2) Plaintiffs' MDJA claim in Count 7 because declaratory judgment is a type of

relief, not a cause of action; and (3) Plaintiffs' RICO claims in Counts 8 through 10 because, over three versions of the Complaint, Plaintiffs have failed to adequately allege a sufficient pattern of racketeering activity.

The Court will also grant Defendants' motion to file an amended declaration and will deny Plaintiffs' motion to strike.

Date:  July 29, 2025                    _____/s/_____
                                        Adam B. Abelson
                                        United States District Judge